### Ex parte HAMMOND.

### HAMMOND v. SITTEL.

#### No. 6831.

Circuit Court of Appeals, Ninth Circuit.

June 24, 1932.

Rehearing Denied Aug. 1, 1932.

Murphy & Doherty and George B. Webster, all of Los Angeles, Cal., for appellant.

A. I. McCormick, Lloyd R. Massey, Ames Peterson, Samuel W. McNabb, U. S. Atty., and P. V. Davis, Asst. U. S. Atty., all of Los Angeles, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

This is an appeal from an order of the District Court on habeas corpus proceedings remanding the appellant to the custody of the United States marshal to be held for extradition to Canada in pursuance of an order of the United States Commissioner to that effect. The appellant relies upon the following propositions:

"I. The evidence on the part of the demanding government, and all the evidence in the record, shows that the offense, if any, was committed in the state of California and not in the jurisdiction of the demanding government.

"II. Under all the evidence in the case the appellant is not a fugitive from the justice of the demanding government nor a person within the meaning of the treaty of 1842 and its supplements and amendments."

The crime charged is that of obtaining money ($30,000) by false pretenses from the Regal Petroleum Company at Calgary, Canada. The United States Commissioner found from the evidence that there was reasonable ground to believe that such a crime was so committed by the defendant at the time and place charged. This finding is challenged as unsupported by the evidence. The basis of the claim is that the money was obtained from the Regal Petroleum Company in payment of a draft drawn by the appellant's agent, acting for him and in his name, upon the Bank of Montreal at Calgary to be charged to the account of the Regal Petroleum Company, which draft was deposited in the Western National Bank at Los Angeles, Cal., to appellant's credit. The draft was forwarded to Calgary, Canada, by the correspondents of the Western National Bank, where it was presented to and paid by the Bank of Montreal and charged to the account of the Regal Petroleum Company at Calgary, Alberta, Canada. Appellant's contention is that his draft having been deposited with his Los Angeles Bank and credited to his account, he then and there procured the only money or property he obtained from the Regal Petroleum Company, and that the offense of obtaining money by false pretenses was then completed; if any such offense were committed, and that jurisdiction thereof is in the state of California and not the Dominion of Canada. In support of this contention appellant confidently refers to the decision of the Supreme Court in Burton v. U. S., 196 U. S. 283, 25 S. Ct. 243, 49 L. Ed. 482, as sustaining his position. In that case the defendant, Senator Burton, received a check in Washington, D. C., which he sold to a bank in Washington. He was charged with receiving compensation at St. Louis, Mo., in violation of law, for services to be rendered in prosecuting a claim against the Post Office Department of the government. The defendant Burton was paid by a check on a St. Louis bank mailed to him at Washington, D. C. This he deposited in his account at a bank in Washington, D. C., without any special arrangement as to the terms of the deposit. It was held that this evidence did not sustain the allegation of the indictment that he had received the checks at St. Louis and that the money was paid to the defendant at St. Louis. The appellee contends that the offense of obtaining money by false pretenses is not completed until the victim parts with the money, that is, until the money is obtained by some one from him because of the false pretenses. Hence, it is claimed that the deposit and collection of the draft is only a means to an end, i. e., to the obtaining money, because of false pretenses theretofore made to the drawee of the draft, and that it is immaterial whether the bank at Los Angeles, Cal., purchased the appellant's draft or accepted it for collection, for in either event the appellant set in motion the agencies which resulted in obtaining the money from the Regal Petroleum Company in Calgary, Canada. The evidence, however, tended to show, and justified the conclusion and finding of the United States Commissioner that appellant's draft, that is, his order upon the Bank of Montreal, to pay $30,000 to the Western National Bank of Los Angeles or its order, and to charge the same to the account of the Regal Petroleum Company, was deposited for collection. Hence, when it was collected for him the various correspondent banks were his agents in obtaining the money from the defrauded company. Appellant telegraphed his secretary in Los Angeles, Cal., from Chicago, Ill., to immediately draw on the Regal Petroleum Company at Calgary, Canada, and to have the Western National Bank send direct to Calgary for collection, "Canadian bank to wire when paid." The secretary testified at the hearing before the Commissioner that she did as directed. In addition, it was stipulated, as we under-

stand the record, that it was the custom of banks to accept such negotiable instruments, when deposited, for collection only although at once credited to the account of the depositor. The following colloquy between the Commissioner and Mr. Doherty, representing appellant, and Mr. McCormick, representing the Canadian government at the hearing before the Commissioner in the extradition proceedings, will so indicate:

"The Commissioner. Well, we would have to take proof as to the practice of banks in matters of drafts, which of course, this is probably something that we cannot take notice of; where an ordinary procedure in banks, where a draft is drawn, it is usually credited and sent forward for collections, and if the draft is honored, all right; if it is dishonored, it is charged.

"Mr. Doherty. That is true, your Honor.

"The Commissioner. I think that we could probably agree as to what the practice of the banks is.

"Mr. McCormick. That is true.

"The Commissioner. As to drafts.

"Mr. McCormick. The same thing as in checks.

"Mr. Doherty. I think counsel is anticipating what my proof will be. I prefer to make it in the form of what we would consider to be the more orderly way, if I will be permitted to do that.

"The Commissioner. It will be all right.

"Mr. Doherty. The ultimate fact I seek to prove is that the draft was deposited by or taken and presented to the bank by the witness, Miss Litton, pursuant to the telegraphic instructions which she received from Mr. Hammond in Chicago, and that Mr. Hammond's account was credited with a sum slightly less than $30,000, $29,997.50, which I presume was a discount for exchange, or some incidental.

"Mr. McCormick. I presume that may be true.

"We object to it on the ground that it is entirely immaterial. The witness has testified that in the city of Chicago he sent this telegram telling his secretary to draw on the Regal, through the Western Bank of Calgary, and proof shows that was done and the money paid at Calgary to the order of the accused.

"Mr. Doherty. Well, you are assuming a question of law there.

"Mr. McCormick. No, that is facts.

"The Commissioner. If you could stipulate that it was credited to his account at that time, at the bank here, you will argue that later on.

"Mr. McCormick. I cannot stipulate it. But I will stipulate, if Mr. Doherty says that is what the witness will testify to, I will so stipulate.

"Mr. Doherty. I am making my offer of proof of that, and that will be her testimony.

"Mr. McCormick. We so stipulate.

"Mr. Doherty. That will be all."

If the Commissioner determined from this evidence that the draft was deposited for collection, as his opinion shows he did, and as we must assume he did in support of his order, we cannot in habeas corpus proceedings question the correctness of his conclusion, for there was clearly reasonable ground to believe the appellant guilty. See Fernandez v. Phillips, 268 U. S. 311, 45 S. Ct. 541, 69 L. Ed. 970; Terlinden v. Ames, 184 U. S. 270, 22 S. Ct. 484, 46 L. Ed. 534; Charlton v. Kelly, 229 U. S. 447, 33 S. Ct. 945, 57 L. Ed. 1274, 46 L. R. A. (N. S.) 397. In the event that the draft was deposited for collection only it is clear that the banks collecting the draft in Calgary, Canada, were acting as agents of the appellant. Spooner v. Bank, 144 Ga. 745, 87 S. E. 1062; White v. Miners' National Bank, 102 U. S. 658, 26 L. Ed. 250; Old National Bank v. German-Amer. Bank, 155 U. S. 556, 15 S. Ct. 221, 39 L. Ed. 259; Balbach v. Frelinghuysen (C. C.) 15 F. 675; Fifth National Bank v. Armstrong (C. C.) 40 F. 46; Richardson v. Louisville Banking Co. (C. C. A.) 94 F. 442. It has been held that the offense of obtaining money under false pretenses is committed, if and when and where the victim parts with his money as a result of the false pretenses. This was the view expressed by the California District Court of Appeals in People v. Chapman, 55 Cal. App. 192, 196, 203 P. 126, 128, where the court said: "Without doubt, the crime of obtaining money or property by false pretenses is consummated at the place where the money or property is obtained from the defrauded person, regardless of where the false pretenses may have been made, and therefore the place where the money or property is obtained is the place where, ordinarily, the venue should be laid. People v. Cummings, 123 Cal. 269, 55 P. 898. In State v. Shaeffer, 89 Mo. 271, 1 S. W. 293, the defendant, who was prosecuted in the Missouri court for obtaining money by false pretenses, had drawn a draft in that state on the bank account of the drawee in New

York; the money. being collected through the agency of two other banks in New York and Missouri, respectively. It was held that the money was obtained in New York; that therefore the crime was consummated in that state and not in Missouri; and that, as a consequence, the Missouri court had no jurisdiction."

The rule is similarly stated in Bishop's New Criminal Law, p. 55, vol. 1, ch. VI, § 110. The rule is thus stated in Ford v. U. S., 273 U. S. 593, 47 S. Ct. 531, 540, 71 L. Ed. 793:

" 'Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power.' [Strassheim v. Daily, 221 U. S. 280, 31 S. Ct. 558, 55 L. Ed. 735.] * * *

"In the course of the examination of this question, Mr. Moore, recognizing the principle already stated, said:

" 'The principle that a man, who outside of a country willfully puts in motion a force to take effect in it, is answerable at the place where the evil is done, is recognized in the criminal jurisprudence of all countries. And the methods which modern invention has furnished for the performance of criminal acts in that manner has made this principle one of constantly growing importance and of increasing frequency of application.' "

See, also, People v. Bryant, 119 Cal. 595, 51 P. 960; People v. Rabe, 202 Cal. 409, 423, 261 P. 303; State v. Balliet, 63 Kan. 707, 66 P. 1005; Musgrave v. State, 133 Ind. 297, 32 N. E. 885; Sandy v. State, 60 Ala. 58, 60.

■ The other point presented by appellant is based upon the claim that he does not come within the terms of the applicable treaty with Great Britain (the Webster Ashburton Treaty, concluded August 9, 1842, 8 U. S. Stat. L. 572, Malloy Treaties, etc., vol. 1, p. 650; and the Supplementary Extradition Treaty proclaimed April 22, 1901, art. 1, part 2, Malloy on Treaties, etc., pp. 780, 781, 32 Stat. L. 1864), for the reason that he is not a fugitive from Canada, having made the false pretenses at Chicago, Ill., after he had left Canada and never having returned there. The applicable provision of the treaty is article 10, which is as follows: "It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them, or their ministers, officers, or au-

thorities respectively made, deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other: provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed: and the respective judges and other magistrates of the two Governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper Executive authority, that a warrant may issue for the surrender of such fugitive. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition, and receives the fugitive."

This treaty clearly applies to any person within the jurisdiction of either nation who has committed an extraditable offense within the jurisdiction of the other. Appellant contends that this clear and definite language should be construed to apply only to fugitives because that term is used in title and preamble of the treaty and in the proclamation, announcing that the treaty is in effect. The treaty applies according to its terms to both those who "shall seek an asylum," and to those who "shall be found," therein. We see no reason for limiting the plain provisions of the statute. The Supreme Court in the decision from which we have quoted (Ford v. U. S., 273 U. S. 593, 47 S. Ct. 531, 71 L. Ed. 793, supra) shows the desirability of surrendering a person for trial who puts in motion forces which operate to consummate a crime within the territory of the demanding nation (see, also, Palliser v. U. S., 136 U. S. 267, 10 S. Ct. 1034, 34 L. Ed. 514; Benson v. Henkel, 198 U. S. 1, 25 S. Ct. 569, 49 L. Ed. 919), and there is no reason to suppose that the treaty was intended to exclude such a class of offenders; on the contrary, the treaty expressly agrees to sur-

render them. The decision of the Circuit Court of Appeals of the Second Circuit, rendered in Sternaman v. Peck, 83 F. 690, supports this view, and no case is cited to the contrary, nor have we found any.

Order affirmed.