**UNITED STATES of America ex rel.
Mehdi EATESSAMI, Relator,**

v.

**Anthony R. MARASCO, United States
Marshal for the Southern District
of New York, Respondent.**

**No. 67 Civ. 3983.**

United States District Court
S. D. New York.

Nov. 10, 1967.

Friend & Reiskind, New York City, for relator.

Lovejoy, Wasson, Lundgren & Ashton, New York City, for the Government of the Confederation of Switzerland.

## OPINION

TYLER, District Judge.

This writ of habeas corpus application brings up for review a determination of extradition rendered by a United States Commissioner in this district on October 13, 1967. See 18 U.S.C. § 3184 (1964).

After considering oral arguments in this matter on October 20, 1967 and upon review of the transcript of the record before the Commissioner, I can perceive no legal or factual reason for disturbing his determination that extradition should lie.

These proceedings grow out of an extradition warrant issued by an investigating magistrate in the Canton of Geneva where there have been filed against, among others, the relator charges of embezzlement, fraud, forgery and use of forged documents in violation of Articles 148, 251 and 255 of the Swiss Criminal Code of December 21, 1937. Hearings on the matter were held before Commissioner Bishopp on August 30 and 31, September 1, 5, 6, 7 and 15, and October 9 and 13, 1967. On the last date, the Commissioner rendered his decision that the Swiss government had established probable cause for extradition of the relator and remanded him to the custody of the marshal awaiting a final extradition warrant from the Secretary of State.

Upon these habeas corpus proceedings, counsel for the relator makes a number of arguments, the most significant of which can be fairly summarized as follows:

1. the evidence before the Commissioner failed to establish a prima facie case or probable cause as required by law and the express terms of the governing extradition treaty between the United States and Switzerland;

2. the scope of the treaty in question is insufficient to permit extradition, at least in the factual context of this particular case; and

3. the original complaint before Commissioner Bishopp was insufficient; moreover, the amended complaint filed by the Swiss government was untimely, thereby creating unfair surprise and resultant prejudice to the relator.

■ Since this matter is before the court on a petition for habeas corpus relief, it is well to remember that such a remedy is available only to inquire whether the Commissioner had jurisdiction, whether the offenses charged are within the treaty between Switzerland and this country and whether or not there was any evidence to support the Commissioner's findings of probable cause. Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925).

■ As to the issue of probable cause, I have read the record before the Commissioner and determine that there was ample evidence to support his findings in this area. In brief, the crimes charged against relator are based upon two loans obtained through fraudulent misrepresentations and by the use of forged and counterfeit stock certificates presented to the lender, the Swiss Bank Corporation. In April, 1963, arrangements were made here in New York City to open a numbered bank account in the name of one Motlag at the Swiss Bank Corporation. Counterfeit securities were sent through Manufacturers Hanover Trust Company to the main office of Swiss Bank in Geneva. That office approved a loan of $165,000 to Motlag "secured" by the fraudulent securities which also had been approved by Swiss Bank. A second loan of $135,-000 was procured under similar circumstances in the name of Motlag in August 1963. There the bogus securities were submitted through Chemical Bank New York Trust Company; again they were approved by Swiss Bank in Geneva which authorized payment of the loan proceeds through the Chemical here in New York. One Heshmat Kamyar, who is presently in custody in Switzerland after having been extradited from Israel, has testified to the Swiss investigating magistrate by statements and affidavits that he was a close friend and former associate of relator; that under the supervision and direction of relator, he made arrangements here in New York City to secure the loan of $165,000;

and that the proceeds of this loan in the form of traveler's checks were turned over to relator and a man named Aadal. There is before the examining magistrate in Switzerland evidence that at least some of these traveler's checks were cashed by Kamyar and Eatessami in Switzerland. Finally, there is evidence before the Swiss magistrate that another individual using the name of Khani has implicated relator as the principal who directed and arranged the obtaining of the loan of $135,000. Kamyar and Khani, significantly, are shown by their admissions and other evidence to have used a forged Iranian passport No. 349902 given to them by Eatessami for purposes of identification in connection with the loan arrangements.

■ Relator first argues that accepting arguendo all the Swiss government evidence as true, it is legally insufficient because it ties him to the crimes charged only by means of admissions of what he calls agents. Put differently, relator contends that the only proof against him is testimony of aiders and abettors or co-conspirators. From this, Eatessami attempts to develop the argument that under the law of New York, which, of course, is the state in which he was found, there is an evidentiary rule that an admission of a co-conspirator is not admissible unless it is part of the res gestae. Assuming without deciding that relator is correct in so stating the applicable law of New York, I consider the argument irrelevant. The federal courts have always recognized that an extradition magistrate need not be bound by the specific rules of evidence or rules governing the admissibility of evidence in such proceedings as these. Similarly, an extradition magistrate need not be concerned about acting only upon evidence which would be sufficient to convict under the laws of the place where he sits. Hearsay evidence, for example, may be considered by a judge or United States Commissioner sitting as an extradition magistrate. In short, it is the usual rule, at least in this circuit, that the hearsay character of evidence in such

proceedings goes to its weight but not to its admissibility. See United States ex rel. Klein v. Mulligan, 50 F.2d 687 (2d Cir.), cert. denied, 284 U.S. 665, 52 S.Ct. 41, 76 L.2d 563 (1931). Moreover, there is evidence in the record in addition to the admissions of alleged agents or co-conspirators Khani and Kamyar which serves to tie relator in as a possible offender under the allegations made by the Swiss government. Accordingly, I conclude that Commissioner Bishopp was warranted in finding that there is probable cause to believe that Eatessami may have been a participant in the crimes charged by the investigating magistrate in Geneva.

█ Although not directly related to the issue of probable cause, another argument of Eatessami might be conveniently considered at this point. He makes much of the circumstance that the Swiss government, evidently viewing its original complaint in this court as insufficient, filed an amended complaint at the first day of the evidentiary hearing before Commissioner Bishopp. Relator contends that this late filing of the complaint on which these proceedings rest caused unfair surprise and prejudice to his defensive position. Unfortunately for him, the record of what transpired before the Commissioner establishes that Eatessami and his counsel were neither surprised nor prejudiced by the filing of the amended complaint. See Yordi v. Nolte, 215 U.S. 227, 30 S.Ct. 90, 54 L.Ed. 170 (1909); United States ex rel. Petrushansky v. Marasco, 325 F.2d 562 (2d Cir. 1963).

The more serious issues raised by Eatessami concern the scope of the applicable provisions of the governing extradition treaty. As I view his arguments, relator poses two significant questions in this area:

1. were the crimes committed "in the territory" of Switzerland as meant by Article I of the treaty?

2. must relator be shown to be a "fugitive from justice"—i. e. must the Swiss government establish that Eatessami was within Switzerland's borders at the time of commission of the crimes but thereafter departed therefrom to avoid prosecution by the Swiss authorities?

These questions become pertinent because of relator's arguments that (1) if any crimes were committed, they were committed in New York City, the place where his alleged agents and he received the fruits of the crimes, and (2) since he was absent from Switzerland when the crimes were committed, he could not have fled the jurisdiction of Switzerland to avoid prosecution—i. e. he, Eatessami, was not and is not a "fugitive from justice" and thus cannot be extradited under the treaty.

Treating first the issue of place of the crimes, both parties rely on the test set forth in Ex parte Hammond, 59 F.2d 683 (9th Cir. 1932), cert. denied, 287 U.S. 640, 53 S.Ct. 89, 77 L.Ed. 554 (1932), that the crime of obtaining funds by fraudulent representations is committed at the place where the "victim" parted with his money. Thus, the Swiss government urges that the Swiss Bank parted with its money when it approved both loans in Geneva, thereby requiring a finding that Switzerland is the situs of the crimes. Relator contends that New York was the place of the crimes because the Swiss Bank did not part with the loan proceeds until the two New York banks delivered the money to Motlag. I am inclined to the view that the rationale of Ex parte Hammond, *supra,* at least generally supports the Swiss government here. Admittedly, it is not easy to say upon the facts exactly where the crimes charged against Eatessami were committed; indeed, it can be argued that the facts before this court are sufficiently different from those in *Hammond* to make resort to the agency principle there espoused by the Ninth Circuit a matter of contrivance or judicial legislation in this case.

█ For my part, I believe it unrealistic in the mid-Twentieth Century to try to assign a single place to the commission of multinational crimes such as

those here charged by the Swiss government. I interpret the applicable Articles of the treaty in question, particularly Articles I, II and III thereof, to illuminate an intention of the contracting parties to permit extradition whenever the extraditee is shown prima facie to have intended the harm and caused the harm to the demanding state substantially as claimed by the latter. See 2 O'Connell, International Law 797 (1965). *Cf.* Ford v. United States, 273 U.S. 593, 620–624, 47 S.Ct. 531, 71 L.Ed. 793 (1927).

■■■■ As heretofore inferred, there can be no doubt that the crimes charged against relator are specifically included in the enumeration of covered crimes in Article II of the treaty. Moreover, not even relator suggests that these crimes as charged by the Swiss government are not crimes (felonies) under the laws of the United States and the State of New York. In sum, whether this court adopts the functional approach preferred by the writer or relies literally upon Ex parte Hammond,[1] it seems clear that extradition will lie even if it be deemed that relator was not present physically in Switzerland when the main office of the Swiss Bank approved both loans.

■■■■ In reliance upon Hyatt v. People of State of New York on Relation of Corkran, 188 U.S. 691, 23 S.Ct. 456, 47 L.Ed. 657 (1903), relator next urges that it must be shown that he was a fugitive from Switzerland—*i. e.* that he fled from Switzerland sometime after the alleged crimes were committed. This, of course, is the traditional concept—or close to it—of a "fugitive from justice". See, *e. g.,* 1 Bouvier, Law Dictionary 1321 (8th ed. 1914). But, in my view, neither the applicable treaty nor the law imposes such a requirement. Article I of the treaty, for example, provides in significant part that

"The contracting parties bind themselves mutually to surrender such persons as, being charged with or convicted of any of the crimes or offenses enumerated hereinafter in Article II, committed in the territory of one of the contracting states shall be found in the territory of the other state * * *."

Nothing in this language supports relator's contention. Moreover, American extradition treaties are usually construed to regard a fugitive as one who is charged with having committed a crime punishable under the laws of the demanding state, but who is not to be found in that territory after allegedly committing the crime. See 2 Hyde, International Law § 329 (2d ed. 1947).

Relator's reliance upon Hyatt v. People of State of New York on Relation of Corkran, *supra,* is misplaced. That case turned not only upon its peculiar facts but also upon the express provisions of a 1793 extradition statute, Rev.Stat. § 5278 (1875), 18 U.S.C. § 3182 (1964), which dealt with extradition of fugitives demanded by a state or territory of the United States from another such subdivision of the United States. Those provisions required on their face, as the Supreme Court recognized, that there be a showing that the extraditee had fled the jurisdiction of the demanding state or territory in order to avoid prosecution for the crimes in question. Neither the Criminal Code provision here applicable, Section 3184, nor international law generally requires such a showing here.

The remaining contentions of relator are so demonstrably without merit as to deserve no extended comment.

Accordingly, the writ is denied and the stay of Commissioner Bishopp's ruling heretofore granted will expire at 5:00 p. m. on November 15, 1967. It is so ordered.

1. See also Hyde v. United States, 225 U.S. 347, 362–363, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).