### In the Matter of the EXTRADITION OF Michael Ray Beguas AQUINO.

### Mag. No. 09–mj–7035 (ES).

United States District Court, D. New Jersey.

March 4, 2010.

Eric Todd Kanefsky, United States Attorney, District of New Jersey, Newark, NJ, for United States of America.

Mark A. Berman, Hartmann Doherty Rosa Berman & Bulbulia, PC, Hackensack, NJ, for Michael Ray Beguas Aquino.

## *OPINION*

SALAS, United States Magistrate Judge.

This matter comes before the Court by way of the Government's [1] application for the extradition of Michael Ray Beguas Aquino ("Aquino") pursuant to 18 U.S.C. § 3184. The Court has considered the submissions made in support of and in opposition to the pending application, and conducted a hearing on November 23, 2009. Based on the foregoing, the Government's application is **granted.**

First, the Court shall address Aquino's four objections to the Government's application raised during the Extradition hearing. Next, the Court will outline the factual background of this matter. Finally, the Court will consider the legal issues and their application to the facts of the instant matter.

### I. OBJECTIONS

#### (a). Objection # 1.

Aquino's first objection relates to the use of certain statements within the Government's package, specifically Exhibit 2. Extradition Hr'g Tr. 6:1–11, November 23, 2009. Within Exhibit 2, Aquino objects to the use of certain hearsay statements. Aquino relies on 18 U.S.C. § 3190 and the Republic of the Philippine's Rules of Evidence, located in Annex V of the Government's package. Essentially Aquino argues that because some of the statements within the exhibit may not be admitted in the Philippines, those particular statements should not be admissible in the court determining extraditability. *Id.* at

9:20–24. Aquino's objection is misplaced and as such is overruled.

18 U.S.C. § 3190 provides that:

[d]epositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

18 U.S.C. § 3190. In this Court's view, the statute's operative language is that the depositions or other papers shall be received and admitted as evidence … if they shall be properly and legally authenticated. *Id.* Moreover, the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the evidence is authenticated in the manner required. *Id.* Aquino, during the extradition proceeding, asserted that the Government's second exhibit did comply with the November 22, 1996 Extradition Treaty between the United States of America and the Republic of the Philippines (the "Treaty") and was properly authenticated. Extradition Hr'g Tr. 5:23–25, November 23, 2009.

Thus, because the documents are in compliance with the Treaty, Aquino seeks to utilize the Rules of Admissibility from the wanting jurisdiction to keep certain hearsay statements from this Court's pur-

---

[1]. In this application for extradition, the United States Government is acting on behalf of the Republic of the Philippines. Thus, for the

purposes of this Opinion the usage of the term "Government" means the United States Government.

view. This objection raised by Aquino is not unique. In *O'Brien v. Rozman,* 554 F.2d 780, 783 (6th Cir.1977), the appellant claimed that hearsay evidence was not admissible because under 18 U.S.C. § 3190 it would not have been admissible for similar purposes in Canada. *O'Brien v. Rozman,* 554 F.2d at 783 (6th Cir.1977). The Sixth Circuit rejected the appellant's argument and explained that 18 U.S.C. § 3190 merely provides the vehicle for measuring the authenticity of the documents for the purpose of their use in extradition proceedings and does not address the competency of the evidence for the purposes of 18 U.S.C. § 3184. *O'Brien v. Rozman,* 554 F.2d 780, 783 (6th Cir.1977) citing, *Argento v. Horn,* 241 F.2d 258, 263 (6th Cir.) *cert. denied* 355 U.S. 818, 78 S.Ct. 23, 2 L.Ed.2d 35 (1957); *Bingham v. Bradley,* 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136 (1916).

██ This Court agrees with the *Rozman* court's analysis and interpretation of the statute. This Court finds that the statute's purpose is to measure the authenticity of documents for their use in extradition proceedings and is not to determine the competency of evidence which may or may not be used in the wanting jurisdiction. Indeed, the statute is clear-upon the Court's finding of proper and legal authentication, the documents *shall* be admitted.

In addition to the *Rozman* decision, this Court deems it important to note that hearsay evidence is admissible during extradition proceedings. *See, Collins v. Loisel,* 259 U.S. 309, 317, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *Bingham v. Bradley,* 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136 (1916); *United States ex rel. Sakaguchi v. Kaulukukui,* 520 F.2d 726, 730 (9th Cir.1975); *U.S. ex rel. Eatessami v. Marasco,* 275 F.Supp. 492, 494 (S.D.N.Y.1967); *accord, In the Matter of the Extradition of*

*Ben-Dak,* 06–1540(GWG), 2008 WL 1307816 (S.D.N.Y. Apr. 11, 2008); *Simmons v. Braun,* 627 F.2d 635, 636 (2d Cir.1980); *Hoxha v. Levi,* 465 F.3d 554, 561 (3d Cir.2006); *In the Matter of the Extradition of Bolanos,* 594 F.Supp.2d 515, 519 (D.N.J.2009). In fact, Aquino agrees with this very proposition. During the extradition proceedings Aquino, through his Counsel, asserted that "in fact the Government is allowed to introduce it and the Court is allowed to consider hearsay." Extradition Hr'g Tr. 8:1–2, November 23, 2009.

Therefore, because 18 U.S.C. § 3190 merely provides the vehicle for measuring the authenticity of documents for their use in extradition proceedings; because Aquino has attested to the documents' authenticity and compliance with the Treaty; and further because hearsay evidence is admissible during extradition proceedings, Aquino's objection is overruled.

### (b). Objection # 2.

The next objection Aquino raised at his extradition hearing was that the Government failed to provide him with the most recent charging Information in its extradition package and thus, the Government has violated the Treaty. Extradition Hr'g Tr. 12:16–25, November 23, 2009. The Government responded by explaining that Aquino need not be provided the most current charging document. *Id.* at 14:3–6. Rather, the Government asserted that Aquino need only be presented with the charging document which sets forth the defendant's pending charges. *Id.* at 13:20–25, 14:1. That said, the Government further explained that to the best of its knowledge Aquino's charges have not changed. *Id.*

Aquino is correct in that Annex [2] J is not a certified true copy of the Amended In-

---

**2.** The extradition package references its attachments as annexes rather than exhibits.

formation dated May 15, 2006. Annex J is an additional certified true copy of the September 17, 2001 Amended Information. However, a literal interpretation of Article 7 Section 3(b) of the Treaty contradicts Aquino's argument. Article 7 Section 3(b) states that "[i]n addition to the documents referred to in paragraph 2, a request for extradition . . . shall be accompanied by such evidence as . . . would provide probable cause for his arrest and committal . . . and a copy of the charging document."

 "Extradition treaties must be construed liberally to achieve their purpose of providing for the surrender of fugitives to the requested countries." *Lo Duca v. United States,* 95–713(DGT), 1995 WL 428636, at *6 (E.D.N.Y.1995); accord *In the Matter of the Extradition of Ribaudo,* 00–1PG (KN), 2004 WL 213021 (S.D.N.Y.2004). In construing such treaties, form is not to be insisted upon beyond the requirements of safety and justice. *Lo Duca,* 1995 WL 428636, at *6; *cf., In re Neely,* 103 F. 626, 630 (C.C.N.Y.1900) (holding technical objections as to form are not to be given much consideration if the certificates, signatures, etc., are in substantial conformity to the requirements of the statute, thus providing reasonable assurance of authenticity); *see, also, In re David,* 395 F.Supp. 803, 805 (E.D.Ill.1975) (holding mere oversights such as a clerical error shall not affect the validity of the certification, if the certification substantially conforms to the provisions of the statute).

██ In liberally construing this section of the Treaty, the Court fails to find qualifying words which would support Aquino's argument. The Treaty does not state that the most current or the operative charging document must be provided to the defen-dant. Rather, this section merely states that a copy of the charging document must be provided. This Court takes this phrase to literally mean the document which puts the defendant on notice with the charge he stands to face in the wanting jurisdiction.

The Court finds *Lo Duca, Ribaudo, Neely,* and *David* persuasive and a contrary view would likely put form over substance. As previously mentioned, it is uncontroverted that the Government's extradition package complies with the Treaty between the United States and the Republic of the Philippines. Furthermore, upon reviewing all of the submissions within the Government's extradition package, Annex J is the only erroneous document found. In light of the fact that this case has spanned many years and there are thousands of documents—including several Amended Informations—which make up the bulk of this case, it is plausible that this was no more than a minor error in assembling the extradition packet. Thus, this Court does not believe that the Republic of the Philippines deliberately withheld the May 15, 2006 Amended Information from Aquino.

Furthermore, this Court deems this objection to be technical rather than substantive. Aquino is not asserting that he is not aware of the charges against him-the crux of the statute's requirements. Rather, he is merely stating that he does not have the most up-to-date charging document in his hands, a technicality that neither appears deliberate nor critical to the resolution of this matter. Finally, it is important to note that subsequent to Aquino's extradition hearing the Government went through the necessary diplomatic channels and provided Aquino with the most recent charg-

Effectively they mean the same thing. However, for purposes of clarity, this Court will identify the documents based on the term utilized in the submissions to the Court.

ing document, demonstrating that Aquino's charges have remain unchanged.[3]

All of the documents submitted in support of the extradition request conformed to the requirements of Article 7 of the Treaty. Moreover, Aquino's objection with regard to the most up-to-date Amended Information does not undermine the authenticity or reliability of the Government's request. To deny extradition or to determine that a treaty has not been complied with based on a ministerial error-which has been corrected-would be to turn justice on its head and perhaps could open the door to merit less objections. This Court will not engage in such a practice because it would shift the Court's primary purpose, which is to determine whether the Government has met its burden in establishing probable cause. Therefore, this Court need go no further in overruling Aquino's second objection.

### (c). Objection # 3.

Aquino next objected to the Government entering its third exhibit into evidence on two grounds, which were (1) that *Brady* evidence is required under these circumstances and (2) that according to Article 8 of the Treaty, Aquino is entitled to having all documents translated into English. Extradition Hr'g Tr. 26:1–10, November 23, 2009. Since the Court did not utilize any information in the Government's third exhibit in reaching its conclusion the Court need not address this objection.

### (d). Objection # 4.

Aquino's final objection relates to the Court's use of certain information extracted from Mancao and Dumlao during their respective depositions. Aquino's objection, in essence, is that there was certain information obtained from Mancao and Dumlao which fell outside of the Court's Order and thus may logically taint the Court's analysis. Specifically, Aquino objects to the Court's use of information about Aquino's involvement in other murders and other special operations into political opponents of then President Estrada. However, and similar to Aquino's third objection, this objection need not be addressed because the Court neither utilized such information during its analysis nor in reaching its conclusion. Thus, this Court will now turn to the substantive issues involving the Government's petition.

### II. INTRODUCTION

Petitioner, the United States of America (the "Government"), acting on behalf of

---

3. Aquino also asserts in his December 10, 2009 letter that the Court should not consider the supplemented Amended Information because the documents are not certified by the principal diplomatic or consular officer of the Requested State. Notwithstanding the holdings of *Lo Duca, Ribaudo, Neely,* and *David,* Article 7 Section 5 of the Treaty provides two ways for which documents that accompany an extradition request shall be received and admitted into evidence. The first way is the manner that Aquino describes-the documents are certified by the principal diplomatic or consular officer of the Requested state. The alternative is that the documents are certified or authenticated *in any other manner* accepted by the law of the Requested State. The supplemented Amended Information is part of a package which is certified by Hazel C.

Decena–Valdez, a State Prosecutor with the Philippine Department of Justice. The Court fails to see how a certification sworn to by a State Prosecutor would fail to fall under the umbrella of *any other manner.* Moreover, Aquino fails to explain why the Court should believe otherwise. Furthermore, Aquino's charges in the May 15, 2006 Amended Information are the same as the charges in the September 17, 2001 Amended Information. In fact, the only deviation between the two documents are the State Prosecutors who attach their signatures to the Certification. Therefore, while the Court does not deem it necessary to consider these documents in reaching its conclusion, it does deem it appropriate to point out Aquino's misplaced argument.

the Republic of the Philippines's Government, has sought the extradition of Aquino pursuant to 18 U.S.C. § 3184 and the November 22, 1996 Extradition Treaty between the United States of America and the Republic of the Philippines (the "Treaty").

On September 17, 2001, Aquino was charged in an Amended Information[4] with conspiring with others to abduct and kill Salvador Bubby Dacer ("Dacer") and Emmanuel Corbito ("Corbito").[5] The Republic of the Philippines has sought Aquino's presence to stand trial in relation to this charge. However, sometime in 2001 Aquino became cognizant that he may be implicated in the murders of Dacer and Corbito and he fled the Philippines. Cezar O. Mancao Affidavit executed on March 1, 2007 at p. 3 (Annex P to the Blancafor Affidavit) (herein "2007 Mancao Aff."). On April 28, 2006, following the Supreme Court of the Philippines' decision affirming Aquino's inclusion in the Amended Information, Judge Myra V. Garcia–Fernandez, Regional Trial Court of Manila, National Capital Judicial Region, Branch 18, issued a warrant for his arrest.

Originally, the Aquino Extradition Complaint was filed in the United States District Court for the Eastern District of North Carolina. Subsequently, on March 25, 2009, the complaint was transferred to the District of New Jersey and is now under this Court's jurisdiction.[6]

### III. FACTUAL BACKGROUND

The facts of this case are complex. The individuals allegedly involved were members of the Presidential Anti–Organized Crime Task Force (the "PAOCTF"), which was implemented on July 22, 1998, following the Presidential election of Joseph Estrada ("Estrada"). Mancao Dep. 75:1–4 (May 21, 2009). The alleged purpose of the PAOCTF was to combat criminal syndicates both in the government and in the private and public sectors. *Id.* at 74:22–25. Senator Panfilo Lacson ("Lacson") acted as Chief of the Task Force and reported directly to Estrada. Aquino, who served as the Chief of the Operations Division, reported directly to Lacson. *Id.* at 75:22. Cezar Mancao ("Mancao") served as the Chief of the Task Force Luzon Island. *Id.* at 11:24–25. As such, Mancao was equal in rank to Aquino, however, Aquino occupied a higher position. *Id.* at 77:19–20. Glenn Dumlao ("Dumlao") served as the Deputy Chief for Operation of the Task Group Luzon Island under the supervision of Mancao. It is further alleged that because Aquino did not have any direct staff he would occasionally task individuals from Task Force Luzon Island.[7] *Id.* at 77:21–24.

---

4. An Information is a formal charging document. Similar to a complaint it outlines the defendant's charges.

5. The Court notes from the outset that Aquino was not included in the original May 11, 2001 Information. Aquino was implicated in the murders of Dacer and Corbito following the sworn Affidavit by Glenn Dumlao, which was executed on June 12, 2001. In light of Dumlao's Affidavit, the Republic of the Philippines filed a motion for reinvestigation, which was granted on July 4, 2001. As a result of the reinvestigation, the Republic of the Philippine's amended its Information to include Aquino. Moreover, this Court believes it is important

to mention the fact that the Supreme Court of the Philippines has affirmed the decision that Aquino be included in the Amended Information.

6. The Aquino Extradition Complaint was transferred to the District of New Jersey following the Third Circuit Court of Appeals' decision that Aquino be re-sentenced based on his espionage charges.

7. The Court utilizes the word "task" throughout its Opinion because the term was used throughout the submissions to the Court. For the purposes of this opinion, "task" means to

In January of 1999, Aquino tasked Dumlao to conduct a discreet operation whereby he was directed to monitor Dacer at his room in the Manila Hotel.[8] Glenn G. Dumlao Affidavit executed on June 12, 2001 at pg. H (Annex C to the Blancafor Affidavit) (herein "2001 Dumlao Aff."). Upon locating Dacer's room, Aquino ordered Dumlao to surreptitiously enter Dacer's hotel room, to take whatever documents he could find, and to also monitor the individuals that visited Dacer. *Id.* at H–1. However, Dumlao's investigation into Dacer failed to reveal any fruitful information. Dumlao reported the negative development to Aquino who told him "[i]f it cannot be done, just burn it down or bomb it, just as long as their documents and computers are destroyed." *Id.* Dumlao responded with "I'll see sir." *Id.*

With the Dacer investigation at a standstill, Dumlao focused his attention on other assignments. *Id.* at H–2. In or about October of 2000, Aquino contacted Dumlao and told him to revive the Dacer investigation. *Id.* Dumlao explained that at this time he could not as he was too busy with other investigations that were nearing the execution phase. *Id.* In response Aquino instructed Dumlao to turn his file over to Vincente Arnado ("Arnado"). *Id.* The following day Arnado contacted Dumlao with regard to the Dacer investigation. He inquired into the status of the investigation and sought specific information, including *the type of car that Dacer drove* (emphasis added). *Id.* Dumlao explained that he had only been able to discover the hotel rooms that Dacer occupied and that he was unaware of Dacer's vehicle. *Id.*

Mancao subsequently contacted Dumlao and inquired into Arnado's tasking. Apparently, Arnado wrote on a dispatch form

that he was tasked on a special operations assignment, which meant that he was being tasked by Aquino. *Id.* at H–3. However, Dumlao explained that he was not aware of Arnado's assignment. Mancao, concerned with funding, then asked Dumlao to travel with him to visit Aquino. *Id.* When they reached Aquino's office, Mancao asked Aquino about Arnado's assignment; specifically if the assignment had been cleared by Lacson. *Id.* Aquino responded that he would take it up with Lacson. *Id.* As such, Dumlao and Mancao returned to their offices.

In the morning of November 24, 2000, Dacer and his driver Corbito were stopped at a traffic light on the Osmena Highway in Makati City. *See,* Annex A to the Blancafor Aff. at p. 2 (herein "First Pros. Resolution"). While stopped at the light, three cars surrounded Dacer's white Toyota. *Id.* at p. 3. A man wearing a police uniform and carrying an Armalite rifle stepped out from one of the cars that was following Dacer's vehicle and approached Corbito. *Id.* at p. 2. The armed gunman then ordered Corbito to roll down his window. *Id.* Corbito complied, however, upon doing so, the gunman was able to catch the driver side door lock and open the door. *Id.* The gunman then ordered Corbito to step away from the vehicle. *Id.* At this point, three additional armed men emerged from the car behind Dacer's vehicle. *Id.* at pgs. 2–3. The armed men then grabbed Dacer and Corbito, and despite their resistance, forced them into a white van. *Id.* at p. 3. The three vehicles involved then made a u-turn and sped off in the opposite direction towards Cavite. *Id.*; *see, also,* Blancafor Aff. at ¶ 15.

---

delegate, direct, order, or assign another to perform a particular duty.

**8.** Apparently Dacer was openly critical of then President Estrada. 2007 Mancao Aff. at p. 2.

Shortly thereafter, while Mancao and Dumlao were together for a promotional board meeting, Dumlao received a text message from Aquino. 2001 Dumlao Aff. at H–3. The text message stated that Delta (referring to Dacer) had been captured. *Id.* at H–4. The message further explained that Dumlao was to conduct a tactical interrogation, to coordinate with Arnado, and to make sure that no men from Bicol [9] were there. *Id.* Mancao told Dumlao to go there but to keep him informed of his interrogation. *Id.*

Around noon on November 24, 2000, Dumlao found Arnado who stated that "my boys got our subject." *Id.* Dumlao explained that he was aware of the situation and that Aquino wanted him to contact Arnado about interrogating someone. *Id.* at H–5. Arnado suggested that the two drive together to the Metrobank Branch in Cavite. *Id.*; *see, also,* Blancafor Aff. at ¶ 16. While in the vehicle Arnado called Jose Escalante ("Escalante") and told him that the PAOCTF had a police operation and relayed the destination where they were to meet. Blancafor Aff. at ¶ 16.

Upon their arrival Dumlao observed Dacer's white Toyota. Eventually, Dumlao entered a white van and saw two men blindfolded being guarded by a member of the PAOCTF. 2001 Dumlao Aff. at H–6. Dumlao asked one of the blindfolded individuals his name, and he responded with Mr. Bubby Dacer. *Id.* Dumlao then delved into questions which were supplied by Aquino. *Id.* He initially asked Dacer about his conversations with the president, to which Dacer responded "he just asked me for advice." *Id.* Dumlao then asked if the opposition had any plans. *Id.* Dacer responded that "they are my longtime friends. Even in the administration I have many friends but always stay neutral and professional." *Id.* Dumlao, unable to extract any useful information, called Aquino and told him that he could not get anything from Dacer. *Id.* Aquino then directed him to go back to base, to secure any and all documents, and to give them to him. *Id.* Dumlao then found Arnado and explained to Arnado what Aquino had ordered him to do. *Id.* at H–7. Arnado understood and told Dumlao that he would take care of things from here. *Id.* Dacer and Corbito were subsequently taken to a creek in Barangay Buna Lejos, Indang, Cavite where they were strangled to death. Blancafor Aff. at ¶ 17. Dacer and Corbito's bodies were then placed upon a heap of collected wood and tires, doused with gasoline, and set ablaze. *Id.* at ¶ 18.

Following the disappearance of Dacer and Corbito, Mancao was tasked to investigate the case. 2007 Mancao Aff. at p. 2. During his investigation, Mancao explained that he spoke with both Dumlao and Teofilo Vina ("Vina"). When Vina was asked if he had any involvement in the Dacer and Corbito slayings he explained that he had been tasked by Aquino to get Dacer. *Id.* Furthermore, Vina understood the term "get" to mean neutralize. *Id.* at p. 3. Moreover, Dumlao also blamed Aquino for the abduction and murders of Dacer and Corbito-he claimed that Aquino gave illegal orders. *Id.* at p. 3.

Dacer's car was later recovered in Maragondon, Cavite. 2001 Dumlao Aff. at H–7. Aquino phoned Dumlao inquiring about the matter and about the documents that he previously asked Dumlao to secure. *Id.* Upon learning that Dumlao had stored the documents in his vehicle, Aquino instructed Dumlao to secure them for the meantime. However, these documents were later burned because Mancao believed that they were too dangerous to keep laying around. *Id.* at H–8.

---

**9.** Bicol was the region that Dacer was from.

In May of 2001, Lacson was elected Senator. 2007 Mancao Aff. at p. 3. Shortly thereafter, Lacson allegedly sat down with Aquino and Mancao and advised them both to flee the country because the new presidential administration would come after them for the Dacer and Corbito murders. *Id.* As such, on July 1, 2001, Mancao fled the Republic of the Philippines for Hong Kong where he met Aquino. *Id.* From Hong Kong both Mancao and Aquino traveled to the United States of America, eventually settling in different parts of the country-Aquino in New Jersey and Mancao in Florida. *Id.* Despite their separation, the two kept in touch and would see each other several times over the next few years. *Id.* Sometime in August of 2001, Mancao and Aquino met in Las Vegas where Aquino blamed Vina for sloppily dumping Dacer's vehicle where it was easily discovered. *Id.* at p. 2.

### IV. LEGAL STANDARD

■ International extradition proceedings are governed by statute, 18 U.S.C. § 3181–84, and by treaty. *See,* 18 U.S.C. § 3184.[10] Generally, this Court's purpose is limited to determining "whether there is probable cause to believe that the defendant is guilty of the crimes charged. If the evidence is sufficient, the court makes

a finding of extraditability and certifies the case to the Secretary of State." *Sidali v. I.N.S.,* 107 F.3d 191, 195 (3d Cir.1997).

■ To issue a certificate of extradition, the Court's inquiry is limited to the following:

(1) whether there is an applicable Extradition Treaty between the Philippines and the United States;

(2) whether there are pending charges against the proposed extraditee in the requesting country;

(3) whether the treaty authorizes the extradition of the defendant based on the crime which is alleged to have been committed; and

(4) whether there is competent legal evidence to support a finding of probable cause as to the charge for which the extradition is sought.

*See, Bingham v. Bradley,* 241 U.S. 511, 516–517, 36 S.Ct. 634, 60 L.Ed. 1136 (1916); *Ornelas v. Ruiz,* 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896); *In re Extradition of Fulgencio Garcia,* 188 F.Supp.2d 921, 925 (N.D.Ill.2002); *Cheung v. United States,* 213 F.3d 82, 88 (2d Cir. 2000).[11] Aquino only challenges the fourth

---

**10.** 18 U.S.C. § 3184 provides that:

If, on such hearing, [the magistrate judge] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), she shall certify the same, together with a copy of all the testimony taken before her, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and she shall issue the warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

**11.** This Court's personal jurisdiction over Aquino has not been challenged, nor has

Aquino contested that he is the individual named and sought after in the applicable charging document. Aquino is only contesting extradition based on the fourth element-whether the evidence produced by the Government has established probable cause. Mark A. Berman (Counsel for Aquino) contends that the allegations related to Aquino are limited. Furthermore, Berman claims that at most what the Philippine's Government has proven is that Aquino organized the initial investigation into Dacer. Thus, he claims that the evidence presented is insufficient in establishing that Aquino was involved in the actual murders, and therefore, the government has failed to establish probable cause and Aquino should not be deemed extraditable.

element to the Court's inquiry-namely, whether the evidence produced supports a finding of probable cause.

## V. ANALYSIS

### (a). The applicable treaty

The applicable treaty between the United States and the Republic of the Philippines was entered into force on November 22, 1996 ("Treaty"). *See,* Gov. Exhibit 1. In support of the validity of the Treaty, the Government has provided a declaration of David O. Buchholz, an attorney-adviser in the Office of the Legal Adviser, for the Department of State in Washington, D.C., which certifies that the Treaty is currently in full force and effect. *Id.* That said, Aquino has neither challenged the validity nor the applicability of the Treaty. As such, the Court turns to the next factor.

### (b). Aquino's pending charges

The documents submitted by the Government demonstrate that Aquino has been charged with conspiracy, which led to the double murder of Dacer and Corbito. *See,* Amended Information, September 17, 2001, Blancafor Aff. Annex J. The Government provides a certification in support of its assertion that the charges are still pending in the wanting jurisdiction.[12] *See,* Blancafor Aff. Annex T.

### (c). The terms of the Treaty

The Court will now assess whether the offense falls within the scope of the Treaty, and whether the offense is illegal in both countries. The doctrine of dual criminality dictates that the accused can be extradited only if the conduct complained of in the charging document is considered criminal under the laws of both countries. *Quinn v. Robinson,* 783 F.2d 776, 783 (9th Cir. 1986). The Treaty defines extraditable offenses as those punishable under the laws of both contracting parties by deprivation of liberty for a period of more than one year, or by a more severe penalty. *See,* Article 2(1) of the Treaty, Gov. Exhibit 1. Moreover, Article 2(2) of the Treaty includes as an extraditable offense an attempt or conspiracy to commit, aid or abet, counsel, cause, or procure the commission of or being an accessory before or after the fact to an extraditable offense. *See,* Article 2(2) of the Treaty, Gov. Exhibit 1. For such crimes, the Treaty accommodates the differences between the United States and Philippine law by creating an exception to the general dual-criminality requirement and permitting extradition if the crime is punishable under the laws of the requesting state by deprivation of liberty for a period of more than one year. *Id.*

Having reviewed the provisions of the Treaty, the Court believes that Aquino's charge falls within the scope of the Treaty. Indeed, the crime of murder prosecuted under Article 248 of the Republic of the Philippines' Revised Penal Code carries the potential penalty of 20 years and one day to a maximum of 40 years imprisonment. Blancafor Aff. Annex Q. Furthermore, the United States corresponding offense, Title 18 U.S.C. § 1111, carries a maximum penalty exceeding one year of imprisonment. As such, this Court deems the underlying charge satisfies the requirements of the Treaty. Aquino, also does not contest this point; thus, this Court turns to the sufficiency of the evidence presented.

### (d). The evidence presented

The final inquiry this Court must look to determine is whether the evidence is sufficient to sustain the charge. *Sidali v. I.N.S.,* 107 F.3d 191, 195 (3d Cir.1997).

---

**12.** It is also undisputed that the charges against Aquino are still pending.

This Court must analyze whether there is probable cause to believe that the individual committed the acts alleged in the extradition request. *Spatola v. United States,* 925 F.2d 615, 618 (2d Cir.1991). Although the extradition statute, 18 U.S.C. § 3184, is bereft of language which references "probable cause," extradition courts have uniformly interpreted the statutory language to require a finding of probable cause. *See, Vo v. Benov,* 447 F.3d 1235, 1237 (9th Cir.2006); *Sidali v. I.N.S.,* 107 F.3d at 195 (3d Cir.1997).

▮ Furthermore, the probable cause standard applicable to an extradition hearing is the same standard that is utilized in federal preliminary hearings. *Hoxha v. Levi,* 465 F.3d 554, 561 (3d Cir.2006). Thus, the Magistrate Judge's role is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction. *Id.* (citing *Sidali,* 107 F.3d at 199, *quoting Collins v. Loisel,* 259 U.S. 309, 316 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922)); *cf., Ordinola v. Hackman,* 478 F.3d 588, 608–609 (4th Cir.2007). Indeed, a magistrate judge is endowed with limited authority in the extradition process, as extradition has been deemed a matter of foreign policy thereby falling within the discretion of the executive branch. *Lopez–Smith v. Hood,* 121 F.3d 1322, 1326 (9th Cir.1997); citing, *In re Metzger,* 46 U.S. 176, 188, 5 How. 176, 12 L.Ed. 104 (1847).

▮ Moreover, the Federal Rules of Criminal Procedure and Federal Rules of Evidence are not applicable in extradition proceedings. *See,* Fed.R.Crim.P. 54(b)(5); Fed.R.Evid. 1101(d) (3).[13] Rather, "unique rules of 'wide latitude,' govern reception of evidence in Section 3184 hearings." *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir. 1969). That said, the Government must provide the Court with sufficient evidence which would cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused. *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir.1973); *see, also, Ahmad v. Wigen,* 910 F.2d 1063, 1066 (2d Cir.1990). This Court will not accept, without question, the complaint's mere conclusions that the individual whose arrest is sought committed the alleged crime.[14] *Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). Having reviewed all of the materials submitted by the Government and hearing argument by Counsel, this Court believes that the Government has met its burden in providing sufficient evidence to establish probable cause.[15]

Aquino argues that the Government has failed to provide the Court with sufficient evidence to establish probable cause that Aquino committed the alleged offense. Aquino concedes that the Government has provided sufficient evidence with regard to his participation in the abduction of Dacer

---

**13.** *See generally, U.S. ex rel. Eatessami v. Marasco,* 275 F.Supp. 492, 494 (S.D.N.Y.1967) ("The federal courts have always recognized that an extradition magistrate need not be bound by the specific rules of evidence or rules governing the admissibility of evidence in such proceedings as these. Similarly, an extradition magistrate need not be concerned about acting only upon evidence which would be sufficient to convict under the laws of the place where he sits. Hearsay evidence, for example, may be considered by a judge or United States Commissioner sitting as an extradition magistrate.")

**14.** Indeed, this Court has provided Aquino the opportunity, through his Counsel, to depose Mancao and Dumlao to obtain explanatory evidence with regard to their Affidavits.

**15.** Probable cause is defined as "[a] reasonable ground for belief in certain alleged facts." BLACK'S LAW DICTIONARY 1201 (6th ed. 1990).

and Corbito; however, Aquino argues that the evidence is insufficient to establish that he participated in the murders of Dacer and Corbito.

In doing so, Aquino relies on *United States v. Barr*, 619 F.Supp. 1068 (E.D.Pa. 1985). In *Barr*, Northern Ireland sought the defendant's presence for the attempted murder of a British soldier. *Id.* at 1069. The sole piece of evidence which the Government presented to the Pennsylvania court was a written statement by an individual that pleaded guilty to the soldier's shooting. The statement considered by the Pennsylvania court was the following:

"[i]n the meantime Jim Barr from Twinbrook who was a volunteer in the Andersontown Unit arrived in his car ... I told him we were going to have a go at the Brits. I also told him to scout around the top end of Clonard Street for any other foot patrols." *Id.* at 1070.

The Pennsylvania court noted that there was no evidence which indicated that Barr agreed to scout around, partake in the shooting, or drive around. *Id.* In the absence of further evidence, the court concluded that the United States Government had failed to meet its burden, and denied the government's petition for extradition.

The next case cited by Aquino is *In the Matter of the Extradition of Ben–Dak*, 06–1540(GWG), 2008 WL 1307816 (S.D.N.Y. Apr. 11, 2008). In *Ben–Dak*, the wanting country only allowed the court determining extraditability to consider unsubstantiated claims of a foreign prosecutor based on personal knowledge. *Id.* at *6. The court held that it was insufficient for a foreign government to provide "an account of criminal conduct, without citation, sources or references." *Id.* As such, the court did not believe that the Government had sustained its burden.

Finally, the court in *In the Matter of the Extradition of Strunk*, 293 F.Supp.2d 1117 (E.D.Cal.2003), also denied the issuance of a certificate of extradition. In *Strunk*, the court determined, based on the totality of the record, that it could not find probable cause to reasonably believe that Strunk was involved in a conspiracy to kill Nida Blanca-the victim. *Id.* at 1140. However, the court reached this conclusion because one of the key witnesses who implicated Strunk admitted to receiving payment for his confession, and also because the rest of the evidence presented was described as inconsistent and conflicting, providing little competent evidence to support the conclusion that Strunk was involved in the murder. *Id.*

The cases that Aquino relies on are distinguishable. Indeed, the Republic of the Philippines did not seek Aquino's extradition based on the "personal knowledge" of one of its prosecutors. Furthermore, the Republic of the Philippines has provided the Court with more than one piece of information illustrating Aquino's involvement in the crime charged. Also absent from the record is evidence which indicates that any individual received monetary compensation for their testimony, as was the case of *In the Matter of the Extradition of Strunk*. *Id.*

Unlike any of the cases cited by Aquino, the record reveals a sufficient amount of evidence to support the Government's assertion that Aquino was involved in the double murder of Dacer and Corbito. In conducting its probable cause analysis, the Court found the Affidavit by Glenn Dumlao to be critical. Beginning in January of 1999, Aquino tasked Dumlao to monitor Dacer in his hotel room. When Aquino was notified that Dumlao had found Dacer's hotel room, he ordered him to surreptitiously enter the room, take whatever documents he could find, and also instructed Dumlao to monitor the individuals that were visiting Dacer. Dumlao, who was

unable to obtain any useful information, advised Aquino accordingly. Upon hearing Dumlao's report, Aquino is alleged to have instructed Dumlao to either burn down or bomb Dacer's hotel room. *See,* 2001 Dumlao Aff. at H–1.

Later, in October 2000, Aquino again summoned Dumlao intending to revive the Dacer investigation. *Id.* at H–2. When Dumlao explained to Aquino that he was preoccupied with other matters, Aquino asserted that he would assign Arnado to the Dacer investigation.[16] The following day Arnado found Dumlao and posed several questions, one of which was an inquiry into the type of car Dacer drove. *Id.*

Subsequently, on November 24, 2000, Dacer and Corbito were surrounded at gun point, extracted from their vehicle, thrown into the back of a van, and blindfolded. *See,* First Pros. Resolution at pgs. 2–3. Following their abduction, Dacer and Corbito were taken to Cavite, which interestingly enough is the same region where Dacer's white Toyota was found. 2001 Dumlao Aff. at H–7. Upon learning of Dacer's abduction, Aquino sent Dumlao a text message alerting him to the fact that Dacer had been captured and that he should coordinate with Arnado and conduct a so-called tactical interrogation. *Id.* at H–4. Aquino also made sure he told Dumlao that no one from Bicol should be in Cavite. *Id.*

Dumlao then found Arnado and the two were driven to Cavite. While in transit Arnado contacted Escalante and explained that the PAOCTF had a police operation and that they were to all meet at the Metrobank Branch in Cavite. *Id.* at H–5; *see, also,* Blancafor Aff. at ¶ 16. Shortly after arriving at the Metrobank Branch in

Cavite, Dumlao entered the van, which was being guarded, and asked the blindfolded Dacer several questions, all of which were allegedly provided to Dumlao by Aquino. 2001 Dumlao Aff. at H–6. Dumlao initially ensured that the blindfolded man was indeed Dacer. *Id.* Dumlao then questioned Dacer about his involvement with the president. *Id.* Once Dumlao had finished questioning Dacer, he contacted Aquino and explained to him that he was unable to elicit any information from Dacer. *Id.* Aquino, while continuing to oversee this endeavor, then ordered Dumlao to return to base, to secure any and all documents, and to bring them to him. *Id.* Dumlao explained Aquino's directives to Arnado, who responded that he understood and that he would take care of things from here. *Id.* Again, Arnado was under Aquino's control at this point. Later that evening, Dacer and Corbito were strangled to death and then to cover up the murders their bodies were doused with gasoline and burned. Blancafor Aff. at ¶ 17. An additional attempt at concealing the evidence was the disposal of Dacer's vehicle.

The Court notes the distinct pattern of a cover up and the concealing of identities. For example, Aquino referred to Dacer as "Delta." 2001 Dumlao Aff. at H–4. Additionally, Dacer and Corbito were blindfolded the entire time so that individuals could not be identified. Concomitantly, Aquino ensured that no officers from Bicol journeyed to Cavite. Aquino further directed Dumlao to secure all of the documents and to bring them to him following Dacer's interrogation. Moreover, both Dacer and Corbito's bodies were burned so as to conceal any evidence of their identities. Therefore, the Court deems it plausible

---

16. The Court also believes it is important to note that when Mancao questioned Aquino about Arnado's special operations task, Aquino responded that this was something that would be taken up with General Lacson. As such, it is evident that Arnado was being supervised by Aquino with regard to his role in the Dacer investigation.

that Aquino was clearly concerned about making sure that he could not be implicated.

Further, the evidence extrapolated from Mancao's investigation into Dacer and Corbito's disappearances provides additional proof of Aquino's involvement in the victims' murders. Mancao discovered that Aquino gave illegal orders and that Vina was tasked by Aquino to neutralize Dacer. 2007 Mancao Aff. at p. 3. In addition to Dumlao and Vina's statements, Aquino's own comments provide indicia of his involvement in the murders. Indeed, when Dacer's vehicle was recovered, Aquino blamed Vina for sloppily disposing of Dacer's vehicle because it was easily discoverable.[17] *Id.* at p. 2. As such, a reasonable person could deduce that Aquino was involved in the abduction, murders, and cover up of Dacer and Corbito.

In considering the totality of the evidence presented, the Court believes that based on the facts presented, a person of ordinary prudence and caution would conscientiously entertain a reasonable belief that Aquino committed the alleged acts. Aquino was not simply a bystander. There has been ample evidence presented to the Court which supports the Government's position that Aquino was directing others in the investigation, interrogation, and eventual murders of Dacer and Corbito.

Therefore, the Court believes that competent evidence has been produced which justifies holding the accused to await his trial in the Republic of the Philippines. Whether or not Aquino is guilty of the crime alleged will be determined by the court in the Republic of the Philippines-the wanting jurisdiction.

## VI. CONCLUSION

Based on the foregoing, it logical to conclude that Aquino was involved with the double murder of Dacer and Corbito. The Republic of the Philippines' request for the extradition of Michael Ray Beguas Aquino is hereby **granted.** This ruling will be certified to the Secretary of State, together with a copy of all evidence received for this matter. The Court will issue a warrant authorizing the commitment of Aquino, so that he may be held until his surrender to the proper authorities.

---

**17.** International extradition proceedings are not governed by the Federal Rules of Evidence. As such, the hearsay prohibitions do not apply and such testimony is admissible. *See, U.S. ex rel. Eatessami v. Marasco,* 275 F.Supp. 492, 494 (S.D.N.Y.1967); *accord, In the Matter of the Extradition of Ben–Dak,* 06– 1540(GWG), 2008 WL 1307816 (S.D.N.Y. Apr. 11, 2008); *Simmons v. Braun,* 627 F.2d 635, 636 (2d Cir.1980); *Hoxha v. Levi,* 465 F.3d 554, 561 (3d Cir.2006); *In the Matter of the Extradition of Bolanos,* 594 F.Supp.2d 515, 519 (D.N.J.2009).